IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
|---|---|---|
| v. | : | NO. 08-297 |
| DAVID TROY JOHNSON | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                                                                       **June 4, 2009**

David Troy Johnson has been charged with violating 18 U.S.C. § 922(g)(1) (convicted felon in possession of a firearm). He moved to suppress the physical evidence obtained during his December 4, 2007 arrest. A hearing on the matter was held on April 13, 2009. Upon consideration of the parties' memoranda and oral arguments, I will deny the defendant's motion.

**I. Background**

On December 4, 2007, Reading Police Officer Ronald Miko was on patrol in a marked police vehicle in the area of Third and Penn Streets in Reading, Pennsylvania. As he patrolled the area, Officer Miko decided to conduct surveillance of some houses on the 100 block of South Third Street that were suspected of dealing crack cocaine. (Mot. to Suppress Hr'g Tr. 7:20–8:2, Apr. 13, 2009.) Arriving on the block around 2:48 a.m., Officer Miko noticed that the foot traffic going in and out of one of the buildings was consistent with drug sales. (Id. 8:10–15.)

After conducting several pedestrian stops and recovering some drug paraphernalia, Officer Miko decided to enter one of buildings to talk with a resident of the first floor apartment. (Id. 8:16–19.) The male who opened the door was not someone Officer Miko had seen enter the building. (Id. 47:22–25.) After identifying himself, Officer Miko told the man the police had reason to believe that drugs were being sold in the apartment building and asked if he was aware of anything. (Id. 48:22–49:3.) The man said he did not and asked if he was free to leave. (Id. 49:4–6.) Officer Miko told him he was. (Id. 9:11–14.)

Soon there afterwards, the man decided to leave the building. Officer Miko admitted he continued to watch him because he was suspicious of drug involvement. (Id. 49:9–14.) When the individual exited the building, he got into the front passenger seat of a gray Pontiac Grand Prix that had just pulled up. (Id. 9:20–10:2, 11:19–22.) The Pontiac had Pennsylvania registration tags, and the license plate number was GPD-6629. (Id. 10:23–11:2.) The police would later learn that the Grand Prix was being driven by the defendant David Troy Johnson.

Officer Miko went into his vehicle and followed the Pontiac. (Id. 11:11–12:18.) After the Pontiac made four right turns so as to drive around the block, it stopped, and the passenger (the individual with whom Officer Miko spoke) exited the vehicle and walked through the gap between the Pontiac and the officer's patrol car. (Id. 11:23–12:5.) Officer Miko also came to a complete stop within one car length of the Pontiac, and it

was then he noticed that the car's registration tags were expired. (Id. 12:3–5, 15:4–9.) Though it was already December of 2007, the car's registration tags were valid only through November of 2007. (Id. 14:21–15:3.)

Officer Miko radioed that he would be conducting a stop of the Grand Prix (Id. 15:18–20.) Officer Miko continued to follow for a few blocks before activating his emergency lights and sirens. (Id. 16:6–17:1.) Instead of stopping, the Pontiac continued on at a slightly higher speed. (Id. 17:12–23.) Upon the Pontiac's failure to comply, Officer Miko radioed that he was in pursuit of a vehicle that failed to stop. (Id. 18:4–5.)

What followed was a dangerous chase through Reading filled with numerous traffic violations. As the driver, Johnson exceeded the posted speed limits, failed to stop at more than five stop signs, drove through at least two red lights, and drove against the flow of traffic on a one-way street for four blocks. (Id. 18:24–27:1.) At some point during the chase, Officer Miko was joined by Officer Chris Dinger. (Id. 29:1–7.) When Johnson finally stopped near the intersection of South Seventh and Willow Streets, he exited the vehicle and began running down an adjacent alley. (Id. 31:1–3.) Because the alley was too narrow to drive down, Officer Miko continued the pursuit on foot and ordered Johnson to stop. (Id. 31:11–13.) Johnson continued to run on. (Id. 31:18–25.)

While running down the alley, Officer Miko observed Johnson pull a black handgun from beneath his jacket and throw it to the side. (Id. 32:3–6.) Officer Miko notified Officer Dinger that a gun was thrown and continued to chase Johnson. (Id.

32:8–11.) Johnson ran into the backyard of 628 Willow Street and attempted to open the back door. (Id. 34:3–22.) Officer Miko presented his weapon and repeatedly ordered Johnson to show his hands. (Id. 32:23–25.) Johnson did not comply with the order. (Id. 35:1–2.)

Officer Miko approached Johnson and grabbed him. (Id. 35:3–9.) This was the first time the officer physically touched Johnson. (Id. 35:10–12.) Instead of surrendering, Johnson began to wrestle with the officer. (Id. 35:21.) Officer Miko pushed Johnson's head to the ground and ordered him to stop resisting. (Id. 36:3–8.) When Officer Dinger arrived, the officers were able to move the still-struggling Johnson away from the residence and ordered him to remove his hands from his waistband and put them behind his back. (Id. 36:22–37:2.) Johnson continued to refuse to comply; the officers struck him several times. (Id. 37:2–5.) Even when Officer Miko used pepper spray, Johnson still struggled and refused to place his hands behind his back. (Id. 37:5–7.) Eventually, Officer Dinger was able to handcuff Johnson. (Id. 37:8–9.)

After Johnson was handcuffed, one of the officers searched him and found a magazine of ammunition. (Id. 38:24–39:2.) The handgun that Johnson had thrown in the alley was a Heckler and Koch, Model "USP" .45 caliber pistol, which was fully loaded with an extra bullet in the chamber. The magazine found on Johnson's person was a Heckler and Koch magazine manufactured to fit that pistol.

On the basis of Officer Miko's criminal complaint against Johnson, an eleven-

count information was filed in Court of Common Pleas of Berks County, Pennsylvania. (See Def.'s Ex. 1.) There was no charge against Johnson for driving with an expired registration sticker because Officer Miko did not include it. (Mot. to Suppress Hr'g Tr. 42:4–24.) The officer testified that it was not common practice to charge a defendants with every traffic violation when there are so many to be included. (Id. 67:19–24.)

Later investigation revealed that the car was being rented from Enterprise Rent-A-Car. (Id. 76:9–15.) The registration was in fact valid, but the new sticker had not yet been attached. (Id. 69:20–70:6.) When the car was returned to Enterprise Rent-A-Car's lot on December 5, 2007, an employee attached the new sticker. (Id. 77:7–25. But see id. 91:6–11 (stating that the testifying Enterprise Rent-A-Car witness could not remember who physically put on the new registration sticker).)

On May 27, 2008, a federal grand jury charged David Troy Johnson with violating 18 U.S.C. 922(g)(1) (felon in possession of a firearm) for the events occurring on or about December 4, 2007, in Reading, Pennsylvania. (See Indictment (Doc. #1).)

**II. Applicable law**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. Evidence derived from an unreasonable search or seizure is deemed to be "fruit of the poisonous tree" and must be excluded from

trial. Wong Sun v. United States, 371 U.S. 471, 484–85 (1963). Warrantless searches and seizures are *per se* unreasonable unless a judicially recognized exception applies. See Minnesota v. Dickerson, 508 U.S. 366, 372 (1993).

A person is considered to be "seized" by the police when the officer terminates or restricts the individual's freedom of movement through the use of physical force or by a show of authority. Brendlin v. California, 127 S. Ct. 2400, 2405 (2007). A traffic stop, even though limited in purpose and brief in length, is a seizure of the person. See Delaware v. Prouse, 440 U.S. 648, 653 (1979). Police officers may conduct a traffic stop based upon reasonable suspicion that a traffic law has been violated. See Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977).

The party moving to suppress bears the burden of demonstrating a violation of his Fourth Amendment rights. United States v. Acosta, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992). Once the defendant has done so, the burden shifts to the government to establish the reasonableness of the search or seizure. United States v. Coward, 296 F.3d 176, 180 (3d Cir. 2002).

**III. Discussion**

Johnson requests that the court suppress the evidence of the handgun and the magazine as "fruits of the poisonous tree." He argues that the traffic stop and chase were illegal seizures, that his flight and presence in a high crime drug area do not justify those

seizures, and that the handgun and magazine must be excluded as fruits of the constitutional violations. I find none of these arguments persuasive.

**a) Johnson was not illegally seized by the traffic stop or subsequent chase**

Whether or not the Grand Prix's registration was expired, Johnson was not seized by the attempted traffic stop or pursuit on foot because he never submitted to the officer's show of authority.[1] See California v. Hodari D., 499 U.S. 621, 628–29 (1991) (explaining the Court's prior reasoning in Brower v. Inyo County, 489 U.S. 592 (1989), as finding no seizure to have occurred where the police's show of authority—police cars with flashing lights chasing the defendant for nearly 20 miles—did not cause the driver to stop). Here, Johnson never stopped. When Officer Miko first activated his lights and sirens, Johnson continued to drive away; in fact, he increased his speed and initiated a potentially deadly automobile chase. When Johnson finally got out of his car, that could not be considered a stop as he immediately began to run. Indeed, he showed no indication of stopping when Officer Miko ordered him to stop. Because there was no physical stop whether through the officer's authority or the application of physical force, Johnson was not seized at any point of this portion of the events.

It was not until Officer Miko caught up to Johnson who was trying to break into the back door of a private residence that a seizure occurred. By this time, however, Johnson had disposed of his gun in the alleyway. Where there has been no illegal seizure

---

[1] There is no question that Officer Miko used no physical force when attempting to pull over Johnson's vehicle.

for Fourth Amendment purposes and the suspect freely abandons an item during flight, evidence of that item may be used against him at trial. See Hodari D., 499 U.S. at 629. In Hodari D., the Court reversed the California Supreme Court's decision to suppress evidence of drugs the defendant had abandoned while running from the police. Id. The defendant began to run when the police approached. Suspicious, the police gave chase. Right before the pursuing officer tackled and handcuffed him, the defendant tossed away what appeared to be a small rock; it was later determined to be crack cocaine. The Court held that the defendant had not been seized until the officer applied physical force. The abandoned drugs were not the product of an illegal seizure and should not have been suppressed. Similarly here, Johnson was not seized while he was being pursued by the police, and he freely decided to abandon the handgun. As a result, it will not be suppressed.

**B. The magazine was the product of a valid warrantless search**

Evidence of the magazine will not be suppressed because it was the product of a search incident to a lawful arrest. Following a lawful arrest supported by probable cause, a police officer is authorized to perform a warrantless search of the individual. See United States v. Edwards, 415 U.S. 800, 802 (1974). This incidental search "has been traditionally justified by the reasonableness of searching for weapons . . . and evidence of crime . . . ." Id. In this case, probable cause existed to arrest Johnson without a warrant because he fled from the police while violating numerous traffic laws, disregarded

repeated orders to stop, abandoned a handgun while in flight, forcibly attempted to enter a private residence, and resisted arrest.

"The interests justifying search are present whenever an officer makes an arrest." Virginia v. Moore, 128 S. Ct. 1598, 1607 (2008). In addition to safeguarding evidence, a search allows police to ensure their safety "during 'the extended exposure which follows the taking of a suspect into custody and transporting him to the police station.'" Id. at 1607–08 (quoting United States v. Robinson, 414 U.S. 218, 234–35 (1973)). Considering the nature of Johnson's flight, the fact that he abandoned a handgun while being pursued, his failure to follow police instructions, and repeated refusal to show his hands, the officers were justified in searching for weapons or other evidence of crime.[2]

---

[2] Even if there was a prior illegal seizure, evidence of the magazine will not be suppressed because the crimes Johnson committed while fleeing from the police constituted independent grounds for a second, legitimate arrest. Though the Third Circuit has not directly ruled on this issue, the Government indicates that the First, Fourth, Fifth, Eighth, Ninth, Tenth, and Eleventh Circuits have addressed it. See, e.g., United States v. Sprinkle, 106 F.3d 613, 619 (4th Cir. 1997) (denying the defendant's motion to suppress evidence of a gun when the defendant's response to an improper police stop was an illegal action constituting independent grounds for an arrest); United States v. Dawdy, 46 F.3d 1427, 1431 (8th Cir. 1995) (holding that even assuming the police conducted an invalid Terry stop and arrest, a defendant's attempt to resist constitutes independent grounds legitimizing the arrest, and subsequently found evidence need not be excluded); United States v. Waupekenay, 973 F.2d 1533, 1538 (10th Cir. 1992) (holding, on the grounds that the suspect had no reasonable expectation of privacy in his home when he engaged in criminal activity knowing that police officers were present, that "[e]vidence of [the second crime] against police officers in their presence after an illegal entry or arrest will not be suppressed."); United States v. King, 724 F.2d 253, 256 (1st Cir. 1984) (adopting the line of reasoning forwarded in Bailey and Nooks); United States v. Bailey, 691 F.2d 1009, 1016–17 (11th Cir. 1982) (holding that despite "a strong causal connection . . . between lawless police conduct and a defendant's response," the police may arrest the defendant if his response constitutes a new, distinct crime); United States v. Garcia, 516 F.2d 318, 319–20 (9th Cir. 1975) (holding that absent evidence that a border checkpoint was set up to lure suspects to flee, no taint attaches to the defendant's decision to flee and the subsequently discovered evidence was properly admitted); United States v. Nooks, 446 F.2d 1283, 1288 (5th Cir. 1971) (holding that where "[t]he nexus between [the] search and . . . original arrest had been attenuated[,] [t]he fruits of that search cannot realistically be treated as fruits of [the] original arrest.").
District courts in the Second and Sixth Circuits are also in accord. See United States v. Mattiex,

## IV. Conclusion

For the foregoing reasons, I will deny the motion. An appropriate Order follows.

---

2006 WL 2741645, at *5 (S.D.N.Y. Sept. 21, 2006) ("[A]lthough [the defendant's] initial arrest may have been without probable cause, [the defendant] supplied the requisite probable cause by engaging in the separate and distinct crime of resisting arrest."); Marshall v. White, 2006 WL 1791383, at *6 (E.D. Mich. June 27, 2006) (stating that if a defendant's response to an illegal stop is a "new, distinct crime" then the police may arrest that individual and any evidence seized is admissible).